IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Jeffery Knight, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | Case No. 3:21-cv-50330 |
| v. ) | |
| ) | Judge Iain D. Johnston |
| Wexford Health Sources, Inc., and ) | |
| Merrill J. Zahtz, ) | |
| ) | |
| *Defendants.* ) | |

**MEMORANDUM OPINION AND ORDER**

For the reasons stated below, Defendants' motion for summary judgment [82] is granted.[1]

**I. Background**[2]

In August 2021, Plaintiff Jeffery Knight filed the instant lawsuit under 42 U.S.C. § 1983, alleging civil rights violations arising out of the medical care and treatment he received for his urinary and prostate issues while incarcerated at Dixon Correctional Center ("Dixon"). Dkt. 1. As set out in the operative amended complaint, Knight has filed claims against Defendants Dr. Merrill J. Zahtz and Wexford Health Sources, Inc., alleging deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Dkt. 21.

---

[1] The Court thanks recruited counsel for their time and efforts representing Plaintiff in this action.
[2] The following facts are taken from the parties' Local Rule 56.1 statement of material facts. Dkts. 86, 102–04. The facts are undisputed except where noted.

1

Knight was incarcerated at Dixon from April 15, 2019 until January 18, 2023. Dkt. 102 ¶ 1. Wexford is a private company that contracted with the State of Illinois to provide medical care and treatment to inmates at Dixon. *Id.* ¶ 3. Zahtz, the medical director, was a physician employed by Wexford at Dixon. Dkt. *Id.* ¶ 2. Under Wexford's contract with the Illinois Department of Corrections ("IDOC"), Wexford was required to refer patients from Dixon to the University of Illinois at Chicago ("UIC") for routine, elective appointments and treatment. *Id.* ¶ 6. An elective appointment or procedure was scheduled based on the availability of the provider. *Id.* ¶ 6. If an offsite appointment needed to be completed on an urgent basis, Wexford staff may arrange to send a patient to a local clinic for treatment, subject to that clinic's availability. *Id.* ¶ 7.

Knight testified that he had been diagnosed with benign prostatic hyperplasia ("BPH") since approximately 2005. Dkt. 102 ¶ 12. BPH is a non-cancerous enlargement of the prostate. *Id.* ¶ 9. BPH is a common condition that develops in males as they age. *Id.* ¶ 9. Treatment for BPH initially includes the use of medications to shrink the prostate and improve urinary flow. *Id.* ¶ 11. Surgical treatment for BPH may include a transurethral resection of the prostate ("TURP"). *Id.* ¶ 11. Whether surgery was recommended is a quality-of-life issue and there are not specific symptoms to evaluate whether surgery is appropriate for BPH. *Id.* ¶ 11.

On May 21, 2019, nurse practitioner Kristina Mershon saw Knight for a complaint of right flank pain. Dkt. 102 ¶ 14. Knight reported right-sided flank pain for the last 60 days and chronic constipation but no changes in his urinary pattern.

*Id*. Knight further reported that Tylenol extra strength provided some improvement in his pain. *Id*. Mershon diagnosed Knight with right flank pain, ordered several laboratory tests, and prescribed a laxative. *Id*. ¶ 16. Mershon saw Knight again in May and June 2019, and Knight reported concerns about pain, urinary hesitancy, and his inability to ejaculate. *Id*. ¶¶ 17–18. Mershon made a referral request for Knight to receive an abdominal ultrasound and see a urologist. *Id*. ¶¶ 17–18. The requests were approved in June 2019. *Id*. ¶¶ 19–20.

On October 16, 2019, Knight saw Dr. Graham Hale and Dr. Daniel Garvey at the urology clinic at UIC Hospital. *Id*. ¶ 22. Knight reported a 15-year history of worsening prostate problems and bothersome symptoms despite taking Rapaflo. *Id*. ¶ 22. A recent ultrasound and lab testing did not reveal any issues. *Id*. ¶ 22. Hale planned to continue Knight's medications and consider adding more to help with symptom relief until further testing could be completed. *Id*. ¶ 23. On October 17, 2019, Zahtz prescribed Finasteride for Knight pursuant to Hale's recommendation. *Id*. ¶ 23.

On December 5, 2019, Mershon saw Knight at a chronic care clinic. Dkt. 102 ¶ 26. Knight reported ongoing urinary issues, including frequent urination, erectile dysfunction, a weak urinary stream, and issues starting and stopping urination. *Id*. On the same date, Mershon submitted a non-urgent referral request for Knight to return to UIC's urology clinic, noting that all of Knight's recommended testing had been completed without any change in findings and his symptoms continue. *Id*. ¶ 27. Mershon's referral request was approved on December 11, 2019. *Id*. ¶ 28.

3

On February 5, 2020, Knight returned to UIC's urology clinic. Dkt. 102 ¶ 29. Knight had BPH and lower urinary tract symptoms ("LUTS") that were refractory to medical management. *Id.* His American Urologic Association ("AUA") symptom score was 33/35, indicating severe symptoms. *Id.*; Dkt. 86-6 p. 58. Garvey planned to schedule Knight for the next available TURP procedure but to continue Rapaflo and Finasteride in the meantime. *Id.* Garvey testified that Knight's TURP was an elective, non-emergent procedure. *Id.* On February 10, 2020, Zahtz submitted a referral request for Knight to have his TURP at UIC in March 2020. *Id.* ¶¶ 30–31; Dkt. 86-2 ¶ 29. The request was approved on February 19, 2020. Dkt. 102 ¶ 32.

On or about March 16, 2020, the IDOC halted inmate movement inside and outside of Dixon due to the onset of the COVID-19 pandemic. Dkt. 102 ¶ 33. UIC cancelled elective appointments and only allowed operations for emergent cases during the pandemic. *Id.* ¶ 35. Accordingly, Knight's TURP procedure was cancelled by UIC. *Id.* ¶ 35. According to Wexford's scheduling logs, which track the progress of off-site medical appointments for inmates, Knight's TURP procedure was scheduled to occur on March 17, 2020, but was cancelled due to the onset of the COVID-19 pandemic and related lockdowns imposed by the IDOC. *Id.* ¶ 39. One of Knight's urologists testified that UIC began performing elective procedures that were temporarily delayed sometime between June and September 2020. Dkt. 104 ¶ 29. However, the urologist also testified that scheduling elective surgery was an extremely complex process that required the availability of the provider, patient, and hospital. *Id.* ¶ 29.

On May 8, 2020, Knight filed an emergency grievance complaining of severe pain while urinating and issues urinating despite receiving a renewal of his Bentyl and Finasteride. Dkt. 104 ¶ 3. On May 11, 2021, Knight filed an emergency grievance, which in part asked to be taken immediately to a local hospital for his TURP procedure instead of waiting for an appointment at UIC because he was suffering from painful urination and other difficulties with urinating. Dkt. 104 ¶ 4.

On May 19, 2021, Knight was seen by Zahtz regarding his grievance. Dkt. 102 ¶ 43. This was the first time Zahtz learned that Knight's urology appointment and TURP had yet to occur. *Id.* ¶ 46. Zahtz averred that on review of Knight's medical records, he had not sought any treatment for his prostate or urinary issues since February 2020. *Id.* ¶ 45. On examination, Zahtz reported that Knight was in no distress, had normal vital signs, and his prostate was average size. *Id.* ¶ 44. However, Knight testified that at that visit he was in pain from his prostate issues, noting that he was urinating more than 30 times a day. *Id.*; Dkt. 104 ¶ 5.

Zahtz noted in the medical record that Knight needed a urology follow up for his TURP procedure as deemed necessary, noting that the procedure was already approved but not yet scheduled. Dkt. 102 ¶ 46. Zahtz averred that at that time, he would have conferred with the staff in the medical writ office about whether the appointment had been scheduled. Dkt. 102 ¶ 47. Zahtz further averred that based on his custom and practice, he would have asked the scheduling staff in the writ office to reschedule Knight's urology appointment, if possible, given that it had already been approved. Dkt. 102 ¶ 47.

5

On September 16, 2021, Wexford's utilization management department reapproved Knight's urology appointment and TURP. Dkt. 102 ¶ 50. On September 22, 2021, Knight saw Dr. Grace Chen at UIC's urology clinic. *Id.* ¶ 51. Knight reported urinary symptoms and pain and that despite being compliant with Rapaflo and Finasteride, his symptoms did not significantly improve. *Id.* ¶ 51. Chen diagnosed Knight with BPH and severe LUTS with an International Prostate Symptom Score ("IPSS") of 30. *Id.* ¶ 52. Chen planned to schedule Knight with Dr. Omer Acar, the physician who oversaw Chen's assessment of Knight, to perform a TURP at the next available date a month or two out to allow Knight to recover from his September 20, 2021 hernia surgery. *Id.* ¶ 52. Acar testified that Knight's IPSS score indicated severe symptoms. Dkt. 104 ¶ 8. Acar also testified that at the time of the assessment "at least the same conditions, if not worse symptoms were being identified by Mr. Knight such that a TURP procedure was again recommended." Dkt. 104 ¶ 9; Dkt. 86-7 p. 75:20–76:2. Acar further testified that Knight's TURP was an elective procedure that could be scheduled based on his availability and the availability of the operating room. Dkt. 102 ¶ 52.

On September 30, 2021, Zahtz saw Knight after his urology appointment and planned to refer Knight back to UIC's urology clinic for a TURP. Dkt. 102 ¶ 53. Zaht'z request was approved on October 7, 2021. *Id.* ¶ 54. Zahtz saw Knight on November 18, 2021, for his pre-operation assessment and noted he was in good condition for surgery. *Id.* ¶ 55. On November 23, 2021, Knight underwent the TURP procedure at UIC without any complications. *Id.* ¶ 56.

6

On March 9, 2022, Knight returned to UIC's urology clinic for a follow up after his TURP. Dkt. 102 ¶¶ 57–58. Dr. Jason Huang noted that Knight was doing well, and his pathology results were benign. *Id.* ¶ 58. He further noted that Knight had minimal incontinence, better stream, and was happy with his functional outcome from the TURP. *Id.* ¶ 58; Dkt. 104 ¶ 23. Huang recommended that Knight return as needed. Dkt. 102 ¶ 59. Huang testified that the TURP significantly improved Knight's conditions, and Knight did not have any long-term consequences of his LUTS. *Id.*; Dkt. 104 ¶ 23.

Zahtz avers that at no time did Knight's BPH and LUTS necessitate emergency or urgent medical treatment. Dkt. 102 ¶ 64. Zahtz further avers that Knight's TURP was an elective procedure that would be scheduled at the availability of UIC's urology clinic after the lifting of COVID-19 lockdowns and related cancellations. *Id.* ¶ 65. Although Knight disputes these facts, he only points to his own testimony about the pain he suffered while awaiting his TURP and testimony from his urologists about his severe symptoms before surgery and improvement following surgery. Dkt. 102 ¶ 65; Dkt. 104 ¶¶ 1–2, 20–23. Acar testified that to determine if Knight's urethral obstruction worsened since March 2020, one would have to ask Knight questions about his subjective symptoms. Dkt. 104 ¶ 20. Acar was unable to testify if Knight's urethral obstruction had progressed between March 2020 and September 2021. *Id.* ¶ 20.

Zahtz was also not under any incentive from Wexford or the IDOC to control costs by delaying or denying referrals of patients to off-site specialists and cost

7

considerations did not factor into Zahtz's treatment of Knight's BPH and LUTS. Dkt. 102 ¶ 66. It was Zahtz's opinion that it was appropriate and reasonable to maintain Knight as a patient at UIC's urology clinic because he was an established patient and his BPH did not demonstrate the need for emergent or urgent medical treatment elsewhere. *Id.* ¶ 67.

Defendants seek summary judgment on all the claims against them, arguing that the undisputed evidence establishes that they were not deliberately indifferent to Knight's serious medical needs. Dkts. 82–83. Knight responded to the motion for summary judgment, and Defendants filed a reply. Dkts. 101, 105.

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that affects the outcome of the suit." *Fidlar Technologies v. LPS Real Estate Data Solutions, Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016) (quotation marks and citation omitted). "A genuine issue exists as to any material fact when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant must either demonstrate "an absence of evidence supporting an essential element of the non-moving party's claim" or present "affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of his

8

case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

When deciding a motion for summary judgment, the Court must view the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Smith v. Crounse Corp.*, 72 F.4th 799, 804 (7th Cir. 2023). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). Local Rule 56.1 requires a party seeking summary judgment to file an accompanying statement of material facts, with numbered paragraphs and citations to the record supporting those facts. *See* LR 56.1(d). "To adequately dispute a statement of fact, the opposing party must cite specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact." *Kirsch*, 78 F. Supp. 3d at 697; LR 56.1(e)(3); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities."). "District courts are entitled to expect strict compliance with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions."

9

*Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 607 (N.D. Ill. 2011) (internal quotation marks and citations omitted); *see also Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (stating that the court may disregard any part of a factual statement or response that consists of legal arguments or conclusions).

### III. Analysis

Knight alleges that Zahtz denied him adequate medical care in violation of the Eighth Amendment by failing to ensure his approved procedure for his urinary and prostate issues was timely rescheduled. Knight also seeks to impose *Monell* liability on Wexford for having a widespread practice of not ensuring timely scheduling of approved off-site services and sending prisoner's to UIC for offsite treatment despite repeated and persistent delays in offering appointments. Defendants seek summary judgment on the basis that Knight has failed to establish deliberate indifference against Zahtz and his *Monell* claim against Wexford fails as a matter of law.

The Eighth Amendment prohibits deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish a violation of the Eighth Amendment, Knight must show that: (1) he suffered from an objectively serious medical condition; and (2) the defendants were deliberately indifferent to that condition such that they "actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A medical condition is serious if withholding treatment would result in further significant injury or unnecessary and wanton infliction of pain. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). As for

10

the second factor, deliberate indifference is more than mere negligence or even medical malpractice. *See Petties*, 836 F.3d at 728. Deliberate indifference "requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

The parties do not dispute that Knight's urinary and prostate issues constitute an objectively serious medical condition. Accordingly, the only question is whether Knight has presented enough evidence to allow a reasonable jury to conclude that each Defendant acted with deliberate indifference.

**A. Deliberate Indifference – Zahtz**

A prison official is deliberately indifferent only if they "know of and disregard[ ] an excessive risk to inmate health or safety." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Healthcare providers may exhibit deliberate indifference to a known serious condition through inaction, *Gayton*, 593 F.3d at 623–24, or by delaying necessary treatment and thus aggravating an injury or needlessly prolonging an inmate's pain, *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012).

Knight argues that Zahtz subjected him to an unreasonable delay in receiving his TURP procedure. It is undisputed that Knight's surgery, originally scheduled for March 17, 2020, was cancelled by UIC due to the pandemic. Dkt. 102 ¶¶ 35, 39. It is also undisputed that Zahtz first learned that Knight's urology appointment and TURP had yet to occur on May 19, 2021. Dkt. 102 ¶¶ 43, 46. In response, and based on Zahtz's custom and practice, he would have asked the scheduling staff in the writ office to reschedule Knight's urology appointment, if possible, given that it had

11

already been approved. Dkt. 102 ¶ 47. On September 16, 2021, Wexford's utilization management department reapproved Knight's urology appointment and TURP. *Id.* ¶ 50. Knight received an evaluation at UIC on September 22, 2021, and his TURP on November 23, 2021, because his doctor recommended that he wait two months to recover from his recent hernia surgery. *Id.* ¶¶ 51–52, 56.

Knight does not point to evidence showing that when Zahtz learned in May 2021 that his TURP had not been completed that he could have arranged for Knight's surgery any sooner. Garvey testified that UIC began performing elective procedures sometime between June and September 2020. Dkt. 104 ¶ 29. But Knight points to no evidence that his surgery would have been scheduled during this timeframe. Acar testified that in September 2021 Knight's TURP was still considered elective, and Garvey testified that scheduling elective surgery was an extremely complex process that required the availability of the provider, patient, and hospital. Dkt. 102 ¶¶ 6, 52; Dkt. 104 ¶ 29. At most, Knight has shown that Zahtz was negligent in failing to check on the status of his TURP earlier, but this does not amount to a constitutional violation. *See Petties*, 836 F.3d at 728.

Moreover, in alleging an unconstitutional delay in treatment, Knight must bring forth "verifying medical evidence" that the alleged delays of which he complains caused him "some degree of harm" independent of his underlying condition. *Miranda v. County of Lake*, 900 F.3d 335, 347 (7th Cir. 2018) (citing *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). Verifying medical evidence can be expert testimony that the plaintiff suffered because of a delay in treatment or medical record evidence

that shows a delay unnecessarily prolonged and exacerbated pain. *Williams*, 491 F.3d at 715–16.

Knight largely relies on his own testimony that the delay in his surgery caused him to sustain worsening and painful symptoms, noting at his September 2021 urology visit that he had a 17-year history of worsening prostate problems. Dkt. 101 at 11; Dkt. 102 ¶ 51. But Knight does not attribute these worsening symptoms to his delayed TURP procedure, as opposed to his BPH and LUTS conditions themselves. Nevertheless, a plaintiff's own testimony that he experienced untreated symptoms during the delay does not suffice. *See Lisle v. Eovaldi*, No. 16-cv-00422, 2020 WL 1287947, at *7 (S.D. Ill. Mar. 18, 2020). In fact, Huang testified that the TURP significantly improved Knight's conditions, and Knight did not have any long-term consequences of his LUTS. Dkt. 102 ¶ 59; Dkt. 104 ¶ 23.

Knight also points to his IPSS score of 30, indicating that his symptoms were severe. Dkt. 101 at 11; Dkt. 104 ¶ 8. But Knight's score went down in severity from his February 2020 score of 33/35. Dkt. 102 ¶ 29; Dkt. 86-6 p. 58. Additionally, Knight points to Acar's testimony that "at least the same conditions, if not worse symptoms were being identified by Mr. Knight" at his September 2021 consultation. Dkt. 104 ¶ 9; Dkt. 86-7 p. 75:20–76:2. But Acar was unable to testify if Knight's urethral obstruction had progressed between March 2020 and September 2021. *Id.* ¶ 20. Acar further testified that Knight's TURP remained an elective procedure that could be scheduled based on his availability and the availability of the operating room. Dkt. 102 ¶ 52. Knight points to nothing in his medical records that demonstrates the that

13

the delay in his TURP procedure itself caused him any independent harm or exacerbated his condition.

After reviewing the totality of the circumstances of Knight's medical care, Knight has failed to show that Zahtz was deliberately indifferent to his serious medical needs. Therefore, Defendants' motion for summary judgment as to Knight's claim against Zahtz is granted.

## B. *Monell* – Wexford

Knight also claims that Wexford should be held liable under section 1983 for violating his constitutional rights by virtue of its widespread practices that led to a denial of timely offsite treatment for his urinary and prostate issues. Knight seeks to impose *Monell* liability on Wexford for not ensuring timely scheduling of his TURP procedure and scheduling his surgery at UIC despite persistent delays in offering and scheduling appointments.

The Seventh Circuit applies the theory of municipal liability announced in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), in section 1983 claims brought against private companies acting under color of state law. *Dean v. Wexford Health Services, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). To prove a *Monell* claim against Wexford, Knight must show: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir.

2022). Next, Knight must show that a policy or custom demonstrates deliberate indifference. *Id.* The municipal action must also be the moving force behind the federal rights violation. *Id.* This is a rigorous causation standard that requires a direct causal link between the challenged municipal action and the constitutional rights violation. *Id.* at 675–76.

As addressed above, Knight has failed to establish any underlying claim of constitutionally defective medical care by Zahtz. Because the Court has determined that Zahtz was not deliberately indifferent under the Eighth Amendment, there is no underlying constitutional violation that could have been caused by any policy, practice, or custom. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 463 (7th Cir. 2020) ("[I]f the plaintiff's theory of *Monell* liability rests entirely on individual liability, as Donald's does here, then negating individual liability will automatically preclude a finding of *Monell* liability.") (internal quotation marks and citation omitted).

Nevertheless, Knight asserts that Wexford had a widespread practice of: (1) not ensuring timely scheduling of approved off-site services; and (2) not finding local providers to perform these services. To establish a widespread practice or custom claim, Knight must provide evidence that the practice or custom impacted other inmate patients, not just his own medical care and treatment. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). Although it is not impossible for a plaintiff to show a widespread practice or custom with evidence limited to his personal experience, he

15

must show that there is "a true municipal policy at issue, not a random event." *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008).

Knight asserts that Wexford failed to timely reschedule his TURP surgery because it was considered elective and was scheduled at UIC instead of a local provider. However, Knight points to no evidence that Wexford had a widespread practice of delaying offsite services or not referring patients to local providers when necessary. Furthermore, Knight offers nothing to rebut Zahtz's declaration that he was not under any incentive from Wexford or the IDOC to control costs by delaying or denying referrals of patients to off-site specialists and that cost considerations did not factor into Zahtz's treatment of Knight's BPH and LUTS. Dkt. 102 ¶ 66.

Even assuming Wexford had such a policy, Knight points to no evidence suggesting that Wexford's policy caused his delayed TURP procedure. Instead, Knight's surgery was cancelled because of the pandemic. Zahtz began the process of referring him to UIC for his elective surgery once he was made aware that it had not been completed. Knight's surgery was not considered urgent, such that a referral to a local provide was needed. Knight has not pointed to any evidence indicating that the delay in receiving his TURP had any connection to a Wexford policy, as opposed to the provider and hospital's availability. Moreover, Knight has not shown that he would have received his TURP surgery any sooner if he had been seen by a local provider. UIC cancelled Knight's surgery because of the COVID-19 pandemic, and Knight does not assert that other hospitals would have scheduled his procedure any sooner if Zahtz made an urgent referral when he was first notified in May 2021.

Moreover, the Seventh Circuit has been clear that a successful *Monell* claim requires more than one instance—likely more than three—to demonstrate a widespread custom or practice. *See Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). Although no brightline rule exists regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*, *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021), Knight must show that there is "a true municipal policy at issue, not a random event." *Grieveson*, 538 F.3d at 774. Without more, Knight's allegations of a widespread practice by pointing to one delayed surgery after the onset of the COVID pandemic at best suggests an isolated wrongdoing, not a widespread practice.

Thus, because there is no underlying constitutional violation, there can be no section 1983 or *Monell* claim. And even if there were an underlying violation, no reasonable jury could find Wexford's widespread policy caused the violation. Accordingly, Defendants' motion for summary judgment on the *Monell* claim against Wexford is granted. Having granted Defendants' motion for summary judgment on all claims, the Court need not determine whether injunctive relief and punitive damages are available.

17

## IV. Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted. All claims against all parties having been resolved, and this civil case is terminated. Final judgment shall enter.

Date: March 31, 2025        By: _____
                                Iain D. Johnston
                                United States District Judge